IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES,

v.                                                                                                          No. 2:23-cr-00594-MIS

VANESSA ROSE RODRIGUEZ-SOLORIO
 and CASTULO AMAYA,

       Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTIONS TO SUPPRESS

**THIS MATTER** is before the Court on Defendant Castulo Amaya's Motion to Suppress Evidence and Statements, ECF No. 49. Also before the Court is Defendant Vanessa Rodriguez-Solorio's Motion to Suppress Evidence Due to Violation of the Fourth Amendment, ECF No. 55. The Government responded to both Defendants' Motions in a Consolidated Response. ECF No. 57. No Reply was filed.

The Court held an in-person evidentiary hearing on the matter on September 18, 2023. ECF No. 60. At that hearing, the Government presented its chief witness, Border Patrol Agent James Helmick, who was subject to cross-examination by Defendants. The Government also presented exhibits and the Court heard oral argument from both parties. Following the hearing, Defendant filed supplemental briefing, ECF No. 61.[1]

Upon due consideration of the parties' submissions, the record, the witness's testimony, and the relevant law the Court will **DENY** both Motions to Suppress. As both Motions to Suppress

---

[1] During oral argument at the evidentiary hearing, the Government raised *United States v. Canada*, 76 F. 4th 1304 (10th Cir. 2023) in support of its position for the first time. Counsel for Defendant Rodriguez-Solorio requested leave to submit supplemental briefing on the applicability of that case to the present matter. The Court granted leave to both parties to file supplemental briefing expressly limited to that subject. While Defendant did file supplemental briefing, ECF No. 61, the Government did not.

1

make substantively similar arguments addressing the same set of facts, the Court finds that concurrently addressing both Motions satisfies the interests of expedience and judicial efficiency.

## I. STANDARD OF REVIEW

When filing a Motion to Suppress for violation of the Fourth Amendment, the movant bears the initial burden of demonstrating that a search and seizure implicating the Fourth Amendment occurred. *United States v. Goebel*, 959 F.3d 1259, 1265-66 (10th Cir. 2020). The burden then shifts to the Government to show that any search or seizure, if conducted without a warrant, was justified. *Id.*; *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). Any showing by either party must be a by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (establishing "a preponderance of the evidence" as "the controlling burden of proof at suppression hearings.").

When evaluating the evidence on a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give the evidence presented." *Goebel*, 959 F.3d at 1265; *see also United States v. Torres*, 987 F.3d 893, 898 (10th Cir. 2021) (identifying the district judge as the "factfinder" in ruling on a motion to suppress). Any inferences the Court "draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265.

## II. FACTUAL FINDINGS

The following facts are taken from the parties' filings and the testimony of Border Patrol Agent James Helmick ("Agent Helmick") given at the Hearing on the Motion to Suppress. Agent Helmick has served as a Border Patrol Agent for over 20 years, including 11 years in the Las

Cruces region. Transcript of September 18, 2023, Hearing on Motion to Suppress (Tr.) at 5.[2] As an initial matter, the Court finds Agent Helmick credible.

In the late evening of January 18, 2023, Agent Helmick was conducting roving patrol duties on State Highway 185, a two-lane highway running between Las Cruces and Hatch, New Mexico. Tr. at 5. The area between those towns is sparsely populated and primarily rural, with a smattering of agricultural businesses, homes, and one bar (the "Blue Moon"). Tr. at 9, 46. Highway 185 is a winding, indirect route whose path follows the Rio Grande. Tr. at 5-6.

At approximately 10:30 pm, near mile marker 15, Agent Helmick began to trail a northbound silver Cadillac Escalade that was driving under the posted speed limit and swerving across the center lane markings. Tr. at 9. The windows of the vehicle were "limousine" tinted,[3] and Agent Helmick could not see inside the vehicle. Tr. at 11. No other vehicles were on the road at that time. Tr. at 9. Agent Helmick also testified that the vehicle's direction and the time of night were not consistent with the vehicle having just patronized the Blue Moon. Tr. at 68.

Soon after Agent Helmick began to follow the vehicle, it made a sharp and sudden turn—described by the Agent as "panicked," Tr. At 10—into a residential driveaway along Highway 185. Tr. at 10. Agent Helmick was able to record the first three letters of the Escalade's license plate while passing the vehicle and noted its distinctive rhinestone-encrusted license plate holder. Tr. at 11.

Agent Helmick proceeded north on Highway 185 for approximately two miles, and eventually pulled into a concealed location to continue to surveil traffic. Tr. at 12. Around ten

---

[2] The transcript of witness testimony cited throughout this Order is a rough draft received from the clerk of court's office. As such, the final draft of the transcript may have different pagination than the version referred to here.

[3] Excessively darkened.

minutes later, after no other vehicles had passed by his location, Agent Helmick observed the same silver Escalade pass by. *Id*. Agent Helmick began to follow the vehicle again. *Id*. Shortly after, the vehicle again quickly exited the roadway, this time into the driveaway of a joint commercial and residential property known to Border Patrol Agents as the Martinez Roping Arena. Tr. at 14. Agent Helmick was aware that the residence located at the arena was unoccupied and had been for over a year. Tr. at 71. Agent Helmick pulled off the roadway into an area behind the vehicle and activated his emergency lights. Tr. at 15, 49.

While Agent Helmick was stopped behind the Escalade, Amaya, who had been driving, stepped out of the car and moved to its hood. Tr. at 19. Agent Helmick then exited his vehicle. Amaya then, unprompted, claimed that his vehicle had been having overheating problems. Tr. at 20. Agent Helmick observed no corroborating evidence to support Amaya's claim, such as steam coming off the vehicle (despite the night's cold temperatures, measured at between 36- and 38-degrees Fahrenheit). Tr. at 20-21. Agent Helmick informed Amaya that the reason he had stopped was to perform a welfare check on Amaya and the vehicle's occupants. Tr. at 41-42.

Amaya began behaving in a manner described as "agitated," Tr. at 22. At one point, Amaya instructed the as-yet unseen passengers in the vehicle to record the interaction, as Agent Helmick was going going to kill him. Tr. at 61-62. Amaya also told the Agent that the vehicle's passengers were his children and relatives. Tr. at 30.

Agent Helmick then opened the door of the vehicle and observed six passengers inside: Rodriguez-Solorio in the front passenger seat, three individuals seated in the middle row with a child across their laps, and a lone passenger in the vehicle's third row. Tr. at 26-27. Agent Helmick asked the rear passengers how they were, but they could not respond in English. Tr. at 28. Agent

4

Helmick then asked the rear seat passengers where they were from in Spanish, to which they responded "Las Cruces," in "broken, stilted English" that sounded "coached." Tr. at 29.

At some point during Agent Helmick's questioning of the vehicle's passengers, Rodriguez-Solorio claimed ownership of the vehicle. Tr. at 33. After further questioning, Agent Helmick determined that the vehicle's rear passengers were not being truthful as to their birthplace. Tr. at 29. Agent Helmick radioed for backup, and both Defendants were arrested. Tr. at 31. Amaya was searched incident to arrest. Tr. at 31-32. While that initial search did not produce a weapon, Amaya shortly thereafter admitted to the arresting agents that he did have a firearm on his person, which was seized. Tr. at 32-33.

After Rodriguez-Solorio was handcuffed and removed from the vehicle, Border Patrol agents searched her purse, which was still located in the vehicle. ECF No. 55 at 12.[4] That search also produced a firearm. Tr. at 35-36.

Following their arrest, both Rodriguez-Solorio and one of the passengers gave post-*Miranda* statements regarding Defendants' participation in a scheme to smuggle undocumented people from the Mexican border into the United States. ECF No. 57 at 5.

### III.   DISCUSSION

**A. The Agent had sufficient reasonable suspicion to stop the vehicle.**

Both Defendants challenge the Agent's stop as not justified by reasonable suspicion. *See* ECF No. 49 at 3-4, ECF No. 55 at 5-6. To satisfy the Fourth Amendment, an officer may conduct a vehicular stop without probable cause only if he has a reasonable suspicion that criminal activity may be afoot. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Torres,* 987 F.3d at 901.

---

[4] While not entirely clear from the hearing, Rodriguez-Solorio's Motion to Suppress indicates that the search of her purse took place following her arrest and removal from the vehicle, ECF No. 55 at 12, a point the government appeared to concede at oral argument. *See* Tr. at 86.

Although Amaya pulled over voluntarily, the Government does not dispute Defendants' assertion that the Agent's pulling behind Defendants' vehicle and activating his emergency lights constituted a seizure for the purposes of the Fourth Amendment. Tr. at 77.

In determining whether vehicular stops conducted by Border Patrol agents are justified by reasonable suspicion, the Tenth Circuit looks to a non-exhaustive set of factors including:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Cheromiah*, 455 F.3d 1216, 1220-21 (10th Cir. 2006) (from *United States v. Brignoni–Ponce*, 422 U.S. 873, 884 (1975)).

While those factors are informative, they are not absolute. Courts analyzing the reasonableness of any given stop must consider "the totality of the circumstances" underlying any given stop. *Id.* at 1221.

Here, analyzing those factors under the circumstances compels a finding that the Agent's stop of Defendants' vehicle was justified. Highway 185 is a well-known transport route for vehicles smuggling undocumented people, with arrests occurring on an almost "daily" basis. Tr. at 69-70. The stop was conducted approximately 60 miles from the border, well within the 85-mile range from the border the Tenth Circuit has previously found reasonable. *See* Tr. at 74; *Cheromiah*, 455 F.3d at 1221. At the time of the stop, the vehicle was the only one on the road, which is infrequently trafficked at night. Tr. at 59, 74-75. Agent Helmick's extensive experience as a Border Patrol Agent—consisting of over two decades on the job, and over a decade working around

Highway 185, Tr. at 5—spoke to his familiarity with the tactics of human smugglers in the area. As the Agent testified, smuggling operations frequently take place during the hours that Border Patrol agents are conducting shift changes, namely between 10 and 11pm (when the stop occurred). Tr. at 74-75. Amaya's two abrupt turns into residential driveways also strongly indicated that Defendants sought to evade Agent Helmick.

As to specific characteristics of the vehicle, the Government argues that the Cadillac's tinted windows provided further justification for Agent Helmick's stop. ECF No. 57 at 11. The Court disagrees. Tinted windows are exceedingly common in the Southwest (and are essentially a necessity for vehicles in desert climates). Further, while the Tenth Circuit has routinely upheld traffic stops resulting from suspicion that a vehicle's tinted windows are violative of relevant window-tinting statutes, the Government makes no such argument here. *See, e.g., United States v. Ramirez,* 86 F. App'x 384 (10th Cir. 2004); *United States v. Bryant*, 100 F. App'x 788 (10th Cir. 2004). The Cadillac's merely having tinted windows thus does not provide any support for Agent Helmick's stopping the vehicle.

Nevertheless, the totality of the circumstances created adequate justification for Agent Helmick to stop Defendants' vehicle.

**B. The Agent had probable cause to search the vehicle.**

Defendants primarily challenge the Agent's warrantless search of the car on two grounds. First, Defendants argue that if the stop was conducted as a welfare check, the stop should not have extended past the point that the Agent determined the driver and passengers were safe. ECF No. 49 at 4; ECF No. 55 at 7-8. Second, Defendants argue that Agent Helmick did not have probable cause to search the vehicle. ECF No. 49 at 3-4, ECF No. 55 at 9-12.

The Government responds to Defendants by asserting various justifications for Agent Helmick's opening the car door without a warrant. They include the Agent's right to conduct a "protective sweep" of the vehicle, Tr. at 80-83, the Agent's right to conduct a welfare check on the occupants of the vehicle, ECF No. 57 at 14, and the Agent's having probable cause to search the vehicle as part of an investigation into suspected criminal activity, Tr. at 84-85; ECF No. 57 at 14.

The Court finds Agent Helmick had probable cause to search the vehicle, and as such declines to fully address the Government's other arguments.[5] "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (emphasis, brackets, and internal quotation marks omitted). Warrantless searches of vehicles conducted with probable cause are not unconstitutional. *See U.S. v. Crabb*, 952 F.2d 1245, 1246 (10th Cir. 1991).

Here, the circumstances justifying the Agent's initial stop, coupled with Amaya's erratic behavior (which Agent Helmick testified was consistent with distraction tactics employed by human smugglers, Tr. at 82), gave rise to probable cause to check the vehicle for contraband, in this case undocumented persons. As the Agent had probable cause to search the vehicle—

---

[5] The Court notes that the Government's Consolidated Response argues, in part, that Agent Helmick was justified in opening the vehicle door through application of the "community caretaking doctrine," which the Government claims extends to caretaking efforts made to protect an acting officer's own safety. ECF No. 57 at 16. The Court finds this argument unpersuasive.

The Court is similarly skeptical of the Government's attempt at oral argument to apply the facts of *United States v. Canada* to the case at hand. 76 F. 4th 1304 (10th Cir. 2023). In *Canada*, the Tenth Circuit upheld a protective sweep of a vehicle's interior when the defendant in that case committed a "slow roll" and conducted a "furtive movement," both of which created reasonable suspicion in the officers conducting the sweep that the defendant was dangerous and may have had access to a weapon. *Id.* at 1306. The circumstances here, however, are distinguishable from *Canada*. While Amaya's behavior may have been "erratic," ECF No. 57 at 15, the Court does not find that the alleged behavior demonstrated dangerousness or indicated that he may have had access to a weapon.

independently from any concerns about either his own safety or the health and safety of the vehicle's passengers—the evidence obtained from that search is admissible.

### C. Rodriguez-Solorio's firearm is admissible under the inevitability doctrine.

Rodriguez-Solorio seeks to suppress evidence of the gun found during the warrantless search of her purse. ECF No. 55 at 12. The Government argues that evidence from Rodriguez-Solorio's purse is admissible under two theories: first, that her purse was searched incident to arrest, and second, that the gun would have ultimately been discovered through an inventory search of her vehicle and is therefore admissible under the inevitability doctrine. ECF No. 57 at 17-18.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The exclusionary rule precludes the introduction of evidence seized in violation of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

The exclusionary rule, however, is subject to various exceptions. One of those exceptions allows officers to search arrestees' belongings incident to arrest, so long as the search is "justified by either the need to preserve evidence or the need to disarm" the arrestee. *United States v. Knapp*, 917 F.3d 1161 (10th Cir. 2019). Whether or not a search is justified by the exception "depends on whether the purse was within the area the arresting officers could 'reasonably have believed ... [the arrestee] could have accessed . . . at the time of the search.'" *Knapp,* 917 F.3d at 1168 (quoting *Arizona v. Gant*, 556 U.S. 332, 344 (2009)). At the time Rodriguez-Solorio's purse was searched, she had already been arrested and had no access to her vehicle. ECF No. 55 at 12; *see also* Tr. at 86 (wherein the Government appears to concede that point). As such, the search of Rodriguez-Solorio's purse cannot be justified as a permissible search incident to arrest.

Another exception to the Fourth Amendment's exclusionary rule is the inevitability doctrine, which requires a showing that the relevant, unconstitutionally obtained evidence "would have been discovered even without the unconstitutional source." *United States v. Metts*, 748 F. App'x 785, 789 (10th Cir. 2018) (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)). The burden rests on the government to prove that the evidence at issue would have inevitably been discovered through lawful means. *Metts*, 748 F. App'x at 789. The Tenth Circuit has specifically applied the inevitability doctrine in the context of vehicle inventory searches conducted pursuant to arrest and has held that evidence obtained as the result of such searches is admissible. *See, e.g.*, *United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998).

Here, the Government characterized Agent Helmick as testifying that the vehicle "was being seized pursuant to Border Patrol policy, which would necessarily involve an inventory." Tr. at 86. But the record does not entirely support this claim. Rather, Agent Helmick testified that Border Patrol's policy was to allow arrestees to keep their personal belongings with them for as long as possible. Tr. at 34-35. As such, the government has not met its burden of proving that the gun would have inevitably been discovered via an inventory search of the vehicle.

Agent Helmick also testified, however, as to Border Patrol's policy of searching a detainee's personal belongings when arrestees are taken to a Border Patrol station for processing. Tr. at 35-36. Such searches are themselves inventory searches, justified on numerous grounds: "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Kendall*, 14 F.4th 1116, 1124 (10th Cir. 2021). Indeed, Agent Helmick identified many of those exact justifications as undergirding Border Patrol's inventory search policy. Tr. at 34-36.

As described by the Tenth Circuit, "the inevitable-discovery doctrine requires a counterfactual inquiry into what 'would have' happened under lawful circumstances." *United States v. Braxton*, 61 F.4th 830, 833 (10th Cir. 2023). Applying such an analysis here shows that under lawful circumstances, Rodriguez-Solorio's purse would have been returned to her following her arrest. At that point, Rodriguez-Solorio would have been taken to the station, where her purse would have been searched pursuant to the Border Patrol's lawful inventory search policy. That search would have produced the gun, and it is therefore admissible under the inevitability doctrine.

## IV.   CONCLUSION

For the foregoing reasons, both Defendant Castulo Amaya's Motion to Suppress Evidence and Statements, ECF No. 49, and Defendant Vanessa Rose Rodriguez-Solorio's Motion to Suppress Evidence Due to Violation of the Fourth Amendment, ECF No. 55, are **DENIED.**

*[signature: Margaret Strickland]*

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE